## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA, TAMPA DIVISION

ROHAN D. DOUGLAS,

      Plaintiff,

vs.

UNITED STATES OF AMERICA,

      Defendants.

_____/

CASE NO.:  8:09cv2145-T33 TBM
**PURSUANT TO LOCAL RULE
3.01(h), DEFENDANT STATES
THIS IS A DISPOSITIVE MOTION**

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY ONLY ON COUNTS I AND II

The Plaintiff, Rohan D. Douglas (alternatively "Plaintiff" or "Mr. Douglas"), by and through his undersigned counsel, and pursuant Fed R. Civ. P. 56 and Local Rule 3.01, hereby moves this Honorable Court for the entry of an Order granting summary judgment as to liability only on the claims of false imprisonment (Count I) and malicious prosecution (Count II) and allowing trial to proceed as to damages on those claims and states as follows:[1]

1.    This case involves the illegal detention and restriction of liberty of an American citizen by the United States of America (alternatively referred to as the "Government").

2.    Plaintiff became a United States citizen on October 16, 1981.

3.    Despite the fact that Plaintiff was a United States citizen, the Bureau of Immigration and Naturalization Services ("ICE") and Detention and Removal Operations ("DRO") put Plaintiff in removal proceedings beginning on November 30, 2005, when an NTA was issued against Plaintiff.

4.    As part of the removal proceedings, ICE and DRO incarcerated Plaintiff on two separate lengthy occasions for a period of approximately 385 days, the first incarceration being

---

[1] Count III, a claim of negligence, is not a subject of this motion.

between November 30, 2005, and September 25, 2005, and the second incarceration being between February 19, 2008, and May 15, 2008.

5.      Plaintiff was then put on electronic monitoring between May 15, 2008, and November 14, 2008.

6.      Since November 30, 2005, the Government, through ICE, has had at the very least constructive knowledge of Mr. Douglas's citizenship status.

7.      Since January 18, 2006, the Government, through ICE, DRO and/or its agents or representatives, has had actual knowledge of Mr. Douglas's citizenship status after he advised deportation officers orally and in writing that he was a United States citizen.

8.      The material facts are not in dispute.

9.      The undisputed material facts demonstrate that Plaintiff is entitled to summary judgment as a matter of law as to liability on the claims of malicious prosecution and false imprisonment.

## I. UNDISPUTED MATERIAL FACTS

Under the immigration laws that existed in 1981, a minor illegitimate child born out of wedlock who was also a legal permanent resident of the United States automatically became a United States citizen when the parent became naturalized. 8 U.S.C. § 1432(a)(3)-(5)(Sec. 321 of Immigration and Nationality Act of 1952)(hereinafter the "INA") (Ex. 4).[2]  On October 16, 1981, Mr. Douglas's mother, Larisene Weiner, became a naturalized U.S. citizen (Doc. # 13, ¶ 1 (admitting ¶ 34 of Plaintiff's Complaint)).  Mr. Douglas was seventeen years-old at the time, an illegitimate child born out of wedlock and a legal permanent resident of the United States (Ex.

---

[2] Section 321(a) was repealed by the Child Citizenship Act of 2000, Title I, § 103(a), P.L. 106-395, 114 Stat. 1631 (eff. 02/27/2001).  The new INA Section 320 is codified at 8 U.S.C. § 1431.  The new section is not retroactive. Thus, the repealed Section 321(a) is the operative derivative citizenship section in the instant case because all of the operative facts occurred prior to its repeal. See Jordan v. Attorney General, 424 F. 3d 320, 328 (3rd Cir. 2005).

7(c)-(f)).  By way of Ms. Douglas's naturalization, Plaintiff gained "derivative citizenship" and officially became a United States citizen on October 16, 1981 (Doc. # 13, ¶ 1 (admitting ¶ 36 of Plaintiff's Complaint)).   The United States of America ultimately provided Plaintiff with Certificate of Citizenship No. A2420834 indicating that Plaintiff became a citizen of the United States on October 16, 1981 (id. (admitting ¶ 37 of Plaintiff's Complaint)).   The Department of Homeland Security, through ICE and DRO, held Mr. Douglas in various detention facilities while awaiting deportation between November 30, 2005, and September 22, 2006, and again between February 19, 2008, and May 1, 2008, having deemed him not to be a United States citizen or national (No. 2 of Ex. 1).

The Department of Homeland Security on November 30, 2005, had in its possession *and had access to* the "A-file" of Rohan D. Douglas (No. 5 of Ex. 2).   Thus, the Department of Homeland Security on November 30, 2005, had documentation establishing that Rohan D. Douglas was born in St. Kitts, that Larisene Weiner was not married to the biological father of Rohan D. Douglas at the time of Plaintiff's birth and that Larisene Weiner was not married to the biological father of Rohan D. Douglas at the time she became a naturalized United States citizen on October 16, 1981 (id. at No. 2 and Ex. 7(c)).   Additionally, DHS had documentation showing that Rohan D. Douglas was a Legal Permanent Resident when his mother became naturalized on October 16, 1981 (No. 3 of Ex. 2).   In short, the United States Government, through DHS, had documentation establishing Rohan Douglas's United States citizenship on November 30, 2005, when Agents John O'Malley and Jeffrey Fattibene alleged in an NTA that Rohan Douglas was not a U.S. citizen.

On January 18, 2006, Immigration Enforcement Agent Adolphus Teel transported Rohan Douglas from Pinellas County Jail to the Tampa ICE office (Douglas deposition, p. 80, ln. 1 – p.

3

81, ln. 3). While en route, Mr. Douglas told Agent Teel that he was a United States citizen and that he should not be in deportation proceedings (id. at p. 81, lns. 16-25). Agent Teel told Mr. Douglas that other officers had looked into the matter already and determined that he was not a citizen (id. at p. 82, lns. 2-6). Mr. Teel told Mr. Douglas that he would have to speak to a supervisor at Bradenton Detention Facility, where he was due to be transported (id. at p. 88, lns. 4 – p. 89, ln. 7). Mr. Douglas was promptly sent to Bradenton Detention Facility with Officer Teel having done nothing to investigate his situation (id.).

On or about January 19, 2006, after arriving at Bradenton Detention Facility, Mr. Douglas began writing a letter that he submitted on January 24, 2006, to his assigned deportation officer, Carlos Tolentino (id., p. 97, ln. 21-23; p. 99, ln. 22-25). In the letter, Mr. Douglas claimed in paragraph 1 to have been "automatically naturalized" when his mother became a naturalized citizen (Ex. 2 at No. 8; Ex. 7(b)). Officer Tolentino responded to the letter on January 25, 2006, by writing, "Talk to the judge" (No. 10 of Ex. 2; Ex. 7(b)).

On March 1, 2006, Mr. Douglas finally went before an immigration judge for his first appearance (Douglas deposition, p. 114, lns. 11-13). The attorney for the Government, however, did not have his file (id. at p. 115, lns. 14-20). Nevertheless, Mr. Douglas told the judge at that time that he was a United States citizen (id. at p. 116, lns. 7-17). On March 2, 2006, Mr. Douglas and the Government returned to court (id. at p. 119, ln. 20 – p. 120, ln. 1). Mr. Douglas again told the judge that he was a United States citizen (id. at p. 120, lns. 14-20). Counsel for the Government told the judge that her file did not indicate that Mr. Douglas was a United States citizen (id. at p. 121, lns. 6-9). Because all of the proof of Mr. Douglas's United States citizenship was in his A-File and/or his mother's A-File, he had no way at that time to prove his

citizenship (id. at p. 127, lns. 1-22). The Court consequently told Mr. Douglas that without proof of citizenship, he would be deemed to be an alien (id. at p. 121, ln. 6 – p. 123, ln. 23).

Mr. Douglas, representing himself, thereafter began the process of defending himself from deportation by attacking the underlying crimes alleged against him (id. at p. 135, lns. 2-12). Because he was told that he was not a United States citizen, had no evidence in his possession to the contrary, and a judge had made a ruling to that effect in his case, Plaintiff for the next several months of his incarceration did not contest his citizenship and focused solely on defending the underlying criminal charges (id. at p. 168, ln. 13 – p. 184, ln. 19).

Ultimately, in September 2006, Plaintiff's wife contacted Larisene Weiner, Plaintiff's mother (id. at p. 209, ln. 6). Ms. Weiner forwarded a copy of her naturalization certificate to Plaintiff's wife who then forwarded the certificate to the Government (id. at p. 209, ln. 2).

On September 19, 2006, apparently based on this certificate that was in the Government's possession all along, the Government took notice that Plaintiff was potentially a United States citizen (Tr., Sept. 19, 2006, deportation hearing (Ex. 5)). Thus, the matter was discussed in court with Judge Denise Slavin (id.). During the proceedings, Plaintiff told Judge Slavin that he had brought the matter of his citizenship up previously with Judge Padgett on March 1, 2006 (id., p. 9, lns. 6-17).[3]

Mr. Douglas remained incarcerated without bond while the Government for the first time attempted to locate and obtain Ms. Weiner's A-File from St. Croix (Douglas deposition, p. 215, lns. 1-24). On September 22, 2006, Mr. Douglas returned to court at which point Judge Denise Slavin granted him bond (Douglas deposition, p. 216, ln. 10).

---

[3] The transcript reflects that Judge Slavin cut off Mr. Douglas as he was explaining how he had previously brought the matter up with Judge Padgett and/or potentially another judge.

Mr. Douglas then filed an N-600 form in open court with Judge Slavin (Tr., Sept. 22, 2006, p. 25, ln. 25 – p. 26, ln. 1 (Ex. 6); Plaintiff's Ex. 7(g)). Upon Plaintiff's release from custody on September 25, 2006, he promptly went to the post office and mailed an N-600 form dated September 18, 2006, to the United States Citizenship and Immigration Service ("USCIS") (Douglas deposition, p. 216, lns. 24-25). This document was not acknowledged by anyone in the Government for nearly two years (Ex. 7(h)).[4] Some time in approximately August of 2008, USCIS examiner Edly Vliet was assigned to handle Mr. Douglas's claim to citizenship (Vliet deposition, p. 57, ln 25 – p. 58, ln. 9). When she first obtained Mr. Douglas's A-file, the September 18, 2006, N-600 form was in the file (id. at p. 34, ln. 17 – p. 35, ln. 9).

Between September 22, 2006, and February 19, 2008, no one within the Department of Homeland Security, including, but not limited to, special agents, officers, analysts or attorneys, did any investigation to determine whether or not Rohan D. Douglas qualified as a derivative U.S. citizen through Larisene Weiner's naturalization in 1981 (No. 13 of Ex. 1).[5] On February 19, 2008, Mr. Douglas was re-arrested and detained by DHS (Doc. # 13, ¶ 10; Douglas deposition, p. 227, lns. 12-15). When he was brought to the Tampa ICE office for processing on February 20, 2008, Mr. Douglas immediately showed Deportation Officer Burt Wehying and other detaining officers the paperwork that garnered his release in 2006, including his mother's naturalization certificate, his N-600 application and his bond paperwork and explained that he was a United States citizen (Douglas deposition, p. 233, ln. 12 – p. 235, ln. 8). Officer Wehying acknowledges that Mr. Douglas explained to him that he was a United States citizen and that he

---

[4] In this regard, on April 28, 2008, Supervisory Deportation Officer Eduardo Roman wrote to Supervisor Immigration Officer Meryl Finnerty, "Would you please examine this N-600 that he filed in 2006 and hasn't been adjudicated?"

[5] This statement was admitted by the Government in response to Plaintiff's First Request for Admissions. Subsequent to this admission, it was learned that Mr. Douglas was not actually released from custody until September 25, 2006 (Douglas deposition, p. 217, ln. 21).

made no effort to locate Mr. Douglas's A-file or his mother's A-file (Wehying deposition, p. 20, ln. 2 – p. 22, ln. 21).  He further acknowledges that he made no effort to call down to Miami to speak with anyone who could help him locate pertinent information within the A-files (id., p. 51, lns. 2-4).  Mr. Douglas was in ICE's custody in Tampa for 8-12 hours and Officer Wehying made no efforts other than looking on a computer screen to determine the veracity of Mr. Douglas's claim to derivative citizenship (id., p. 27, ln. 22 – p. 28, ln. 15; p. 47, ln. 6.).  After Mr. Douglas left the Tampa office, Officer Wehying did nothing to follow-up as to whether Mr. Douglas was a United States citizen (id. at p. 28, ln. 24 – p. 29, ln. 2).

Mr. Douglas was then transported from Tampa to Broward Transitional Center and then to Krome Service Processing Center in Miami where he told deportation officers at both locations that he was a citizen and showed him the paperwork that garnered his release in 2006 (Douglas deposition, p. 237, ln. 11 – p. 240, ln. 20).  DRO immediately transported Mr. Douglas to Glades County before the officers looked into the matter further (Douglas deposition, p. 240, ln. 22).  Upon reaching Glades County Detention Center in Moore Haven, Florida, Mr. Douglas told the officers at that facility that he was an American citizen (Douglas deposition, p. 241, ln. 15 – p. 242, ln. 24).  The officers told Mr. Douglas that they contacted Officer Charles Parra, Mr. Douglas's Deportation Officer, at home and told him about the issue (id., p. 242, lns.14-21).  Officer Parra did nothing at that time to look into the matter (id., p. 242, lns. 14-24; p. 248, lns. 11-22; Parra deposition, (Ex. 9), p. 37, lns. 1-6).[6]  It ultimately took until April 25, 2008, before anyone began to look into the matter (Roman deposition, (Ex. 10), p. 10, ln. 21 – p. 11, ln. 21; Ex. 7(h)).  This is despite the fact that Mr. Douglas filed a third N-600 form on or about March

---

[6] Officer Parra had little memory about anything related to Mr. Douglas's case.  Thus, Mr. Douglas's testimony in this regard is undisputed.  Jones v. U.S., 49 Fed. Cl. 516, 520-21 (Fed. Cl. 2001); Woods v. Paradis, 380 F. Supp. 2d 1316, 1328-29 (S.D. Fla. 2005)("[A]n inability to recall cannot controvert [a witness's] undisputed characterization of the events.").

13, 2008 (Ex. 7(i)),[7] and went on a hunger strike in March or April of 2008 in protest of his detention (Douglas deposition, p. 248, lns. 10-25).

During the second detention, Mr. Douglas was <u>never</u> taken before an immigration judge (Douglas deposition, p. 295, lns. 9-22).   On April 28, 2008, Officer Eduardo Roman wrote an e-mail to Supervisory Information Officer Meryl Finnerty indicating that Rohan Douglas filed an N-600 form in 2006 and that it hadn't ever been adjudicated (Ex. 7(h)).   Less than 24 hours after receiving Officer Roman's e-mail, Ms. Finnerty wrote an e-mail back to Officer Roman informing him that based on her review of the documents, Mr. Douglas appeared to be a United States citizen (<u>id</u>.).   She further clarified at her deposition that when she did later look at documents from the A-file (presumably in preparation for her deposition), it took her only approximately thirty minutes to opine that Mr. Douglas was a United States citizen (Finnerty deposition, (Ex. 11), p. 33, ln. 18, - p. 34, ln. 10).[8]

On May 1, 2008, Mr. Douglas was released from ICE custody and was to be put on electronic monitoring along with other conditions of release (Parra deposition, (Ex. 9), p. 47, ln. 3 – p. 50, ln. 20; Ex. 7(j)).   However, the following fifteen days were spent in the Hillsborough County Jail because Mr. Douglas missed a court date while being detained in Glades County (Douglas deposition, p. 250, ln. 25 – p. 252, ln. 2; p. 257, ln. 20 – p. 258, ln. 21).   It took 15 days to clear up the error that would never have occurred but for the illegal detention.   Thus, the

---

[7] Mr. Douglas filed two N-600 forms with USCIS – one dated 9/18/06 and one dated 3/13/08 (Ex. 7 (g) and (i)). Both have a receipt date of 3/25/08 because when Ms. Vliet saw the 2006 N-600 in Mr. Douglas's A-file, she checked the computer to find a receipt date of 3/25/08 (Vliet deposition, p. 34, ln. 17 – p. 35, ln. 9).   In reality, that receipt date was for the 2008 N-600 form (<u>id</u>.).   She, therefore, mistakenly put the same receipt number on the 2006 N-600 form (<u>id</u>.).   In reality, Ms. Vliet could not say when the 2006 N-600 form was received by USCIS (<u>id</u>. at p. 36, ln. 19 – p. 37, ln. 5).

[8] Ms. Finnerty's only issue after her pre-deposition review was whether or not Mr. Douglas had been legitimated (Finnerty deposition, (Ex. 11), p. 34, ln. 21), a fact easily determined by speaking with Mr. Douglas or either of his biological parents.   Even though, Ms. Finnerty told Officer Ramon to speak with Mr. Douglas, he did not do so and has no recollection of directing anyone else to do so (Ramon deposition, (Ex. 10), p. 14, ln. 20 – p. 16, ln. 2).

Government is responsible for the entire 385 days Mr. Douglas spent in jail/detention facilities between 2005 and 2008.

Mr. Douglas remained on electronic monitoring until he was given a certificate of citizenship on November 14, 2008 (Douglas deposition, p. 258, ln. 22 – p. 259, ln. 7).

## II. SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the court is to construe the evidence and factual inferences arising from it in the light most favorable to the nonmoving party. Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970). Summary judgment can be entered on a claim if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). As the Supreme Court has explained:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a strong showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The trial court's function at this stage of the case is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." Anderson Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (citations omitted). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id. at 248.

## III.  THE LAW

### A.  FTCA

Under the Federal Tort Claims Act ("FTCA"), the United States is liable for the "negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1).  To determine whether a private person would be liable in a given case, courts apply the law of the state where the act or omission occurred. Molzof v. United States, 502 U.S. 301, 305 (1992).  Thus, Florida principles of tort law govern the question of the Government's liability in this case.

This general waiver has certain exceptions which provide that the waiver of sovereign immunity "shall not apply to…[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation…or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.  28 U.S.C. § 2680(a).  This subsection, often referred to as the discretionary function exception, generally shields the government from tort liability based on the acts or omissions of federal agencies and employees when they are exercising or performing a discretionary function.   Andrew Nguyen, M.D. v. U.S., 556 F. 3d 1244, 1250 (11th Cir. 2009)(internal cites omitted).

### B.   The Discretionary Function Exception Does Not Apply to Claims of False Imprisonment, False Arrest or Malicious Prosecution

While certain discretionary acts are exempted from liability under FTCA, "claim[s] arising out of…false imprisonment, false arrest, [or] malicious prosecution" based on the acts of

"investigative or law enforcement officers of the United States…" are included within the general waiver of sovereign immunity. 28 U.S.C. § 2680(h). The Eleventh Circuit has expressly held that the discretionary function exemption does not apply to claims of false imprisonment, false arrest or malicious prosecution, as long as the acts or omissions are committed by federal investigative or law enforcement officers. <u>Andrew Nguyen, M.D.</u>, 556 F. 3d at1260. "'[I]nvestigative or law enforcement officer' means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." 28 U.S.C. 2680(h). The Government has stipulated in the instant case that the relevant DHS, ICE and DRO agents were investigative or law enforcement officers (Doc. # 6).

## C.   Derivative Citizenship

"A child's acquisition of citizenship on a derivative basis occurs by operation of law and not by adjudication. No application is filed, no hearing is conducted, and no certificate is issued when such citizenship is acquired." <u>In re Julio Agusto Fuentes-Martinez</u>, 1997 WL 219496, Interim Decision 3316, 21 I & N., Dec. 893, 896 (BIA 1997). While a person who derives citizenship may apply for a certificate of citizenship pursuant to 8 U.S.C. § 1452 and 8 CFR § 341, the certificate is not required. <u>Id.</u> "It is important to understand that derivative citizenship is automatic; that is, when certain conditions exist, a child becomes a U.S. citizen even though neither parent, nor the child, has requested it and regardless of whether any of them actually desires it." <u>Lewis v. Gonzalez</u>, 481 F. 3d 125, 131 (2nd Cir. 2007).

## D.   Burden of Proof

In deportation proceedings, the Government "has the burden of establishing by clear and convincing evidence that, in the case of an alien who has been admitted to the United States, the alien is deportable." 8 U.S.C. § 1229a(c)(3); <u>Woodby v. INS</u>, 385 U.S. 276, 277 (1966). Some

jurisdictions have held that in deportation proceedings evidence of foreign birth gives rise to a rebuttable presumption of alienage, and the burden then shifts to the petitioner to prove citizenship. See, e.g., Scales v. INS, 232 F. 3d 1159, 1163 (9th Cir. 2000); Fabregas v. INS, 107 Fed Appx. 249, 250 (2nd Cir. 2004).   The Eleventh Circuit has not commented on this issue and courts have been universally unclear about the amount and type of evidence a detainee must put forward during removal proceedings.   Regardless, "[t]hat the Plaintiff had the burden of proving citizenship at his *removal* hearing does not...negate the fact that the INS [does] not have authority to detain him if it knew he was a U.S. citizen."   Nguyen v. United States, 2001 WL 637573 (N.D. Texas 2001)(emphasis added).

This final point is of utmost significance and warrants further discussion.  The best way to explain the distinction is to use Mr. Douglas's mother's situation as an example.  Larisene Weiner was born in St. Kitts in 1946 (Ex. 8(b)).  She obtained her Certificate of Naturalization on October 16, 1981 (Ex. 8(a)).  As discussed later in this memorandum, DHS's computer system to this day still lists Ms. Weiner as an alien (Tolentino deposition, p. 22, ln.1 – p. 23, ln. 2).  Thus, conceivably, Ms. Weiner could be detained today if she was unable to produce her Certificate of Naturalization.  If ICE opted not to look for it in her A-file, she could be detained and ultimately deported.[9]  The Government in this scenario would have operated within the rules of the deportation proceedings and, therefore, any challenge by Ms. Weiner to the proceedings would be without merit.  However, without question, Ms. Weiner would have a cause of action under the FTCA

---

[9] Obviously, this is an extreme example that would presumably be rectified when the Government's immigration attorneys took over the case.  Having said that, it is not entirely implausible that such a scenario could occur considering Mr. Douglas's detention.

against the Government for her illegal detention and deportation. The same analysis is what gives Mr. Douglas a cause of action in the instant case.[10]

## IV. THE GOVERNMENT IS LIABLE FOR MALICIOUS PROSECUTION

With this framework in mind, it is clear that Defendant is liable for Malicious Prosecution. In Florida, it is well settled that in order to prevail in a malicious prosecution action, a plaintiff must establish that: (1) an original criminal or civil judicial proceeding against the present plaintiff was commenced or continued; (2) the present defendant was the legal cause of the original proceeding against the present plaintiff as the defendant in the original proceeding; (3) the termination of the original proceeding constituted a bona fide termination of that proceeding in favor of the present plaintiff; (4) there was an absence of probable cause for the original proceeding; (5) there was malice on the part of the present defendant; and (6) the plaintiff suffered damage as a result of the original proceeding. Alamo Rent-A-Car, Inc. v. Mancusi, 632 So.2d 1352, 1355 (Fla. 1994). "In an action for malicious prosecution it is not necessary for a plaintiff to prove actual malice; legal malice is sufficient...." Id. at 1357. Legal malice, which is also referred to as technical malice or malice in law, "requires proof of an intentional act performed without justification or excuse." Reed v. State, 837 So.2d 366, 368-69 (Fla. 2002). "Legal malice may be inferred from one's acts," and unlike actual malice "does not require proof of evil intent or motive." Id. at 369.

The majority of these elements warrant little discussion. It is clear that the United States of America, through DHS, ICE and DRO commenced a civil proceeding against Mr. Douglas. It is equally clear that DHS, ICE and/or DRO were the legal cause of the proceeding against Mr. Douglas. Next, when Mr. Douglas was finally given a certificate of citizenship and released

---

[10] As the Court will read below, Mr. Douglas actually rebutted the presumption of alienage when he directed ICE officers to his mother's A-file in writing (see Ex. 7(b)).

from all restrictions, this was a bona fide termination of the proceedings in Mr. Douglas's favor. As discussed above, while actual malice is in dispute, there can be no dispute that there was legal malice under Florida law. Finally, there can be no question that Mr. Douglas suffered damages as a result of the removal proceedings brought against him. While the amount of damages should be left to this Court for ultimate determination, the fact that he was injured – that he was deprived of his liberty in some fashion or another for nearly three years – cannot reasonably be contested.

This leaves only one element that requires analysis – the absence of probable cause. As a threshold matter, we must first examine whether or not probable cause is the appropriate standard. Pursuant to 8 U.S.C. § 1357(a)(2), an officer of the "Service" (DHS, ICE, DRO, etc.) is authorized to arrest any alien without a warrant if he has "reason to believe" the alien is in the United States illegally.[11]  See also 8 C.F.R. § 287.5. U.S. courts have consistently held that this phrase is equivalent to probable cause. See U.S. v. Cantu, 519 F. 2d 494 (7th Cir. 1975, cert. denied, 423 U.S. 1035 (1975));  Babula v. INS, 665 F. 2d 293 (3rd Cir. 1981);  Au Yi Lau v. INS, 445 F. 2d 217 (D.C. Cir. 1971), cert. denied, 404 U.S. 864 (1971). Of course, in the instant case, Mr. Douglas was never an alien, making 8 U.S.C. § 1357(a)(2) arguably inapplicable.

Probable cause in the instant case must be examined carefully, taking into consideration what the officers knew or should have known at various points in the removal proceedings. This is because even if we assume that there was probable cause for the initial detention, a lawful detention can become unlawful at the point when the continued detention is no longer reasonable. Caban v. United States, 728 F. 2d 68 (2nd Cir. 1984). "Probable cause" means a reasonable ground of suspicion supported by circumstances strong enough in themselves to

---

[11] When a suspected alien is detained, ICE prepares a "Notice to Appear" ("NTA"). An NTA essentially an administrative arrest warrant that is not reviewed by a neutral magistrate. See, e.g., U.S. v. Abdi, 463 F. 3d 547, 551 (6th Cir. 2006).

warrant a cautious person in belief that the named suspect is guilty of the offense charged. Johnson v. State, 660 So.2d 648, 654 (Fla. 1995)(internal citation omitted).   Inquiry into the reasonableness of an officer's perceptions of critical facts supporting an arrest does not focus upon facts not available to him at the time. City of St. Petersburg v. Austrino, 898 So. 2d 955, 959 (Fla. 2d DCA 2005)(citing Anderson v. Creighton, 483 U.S. 635 (1987)).   "'By the same token, however, it must charge him with possession of all the information reasonably discoverable by an officer acting reasonably under the circumstances.'" Id. (quoting Sevigny v. Dicksey, 846 F. 2d 953, 957, n. 5 (4th Cir. 1988)).   "'A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest.'"   Id. (quoting BeVier v. Hucal, 806 F. 2d 123, 128 (7th Cir. 1988)).

A.     **The Initial Detainer was without Probable Cause**

The NTA signed by Agents Fattibene and O'Malley claims that Mr. Douglas was not a citizen or national of the United States (Ex. 7(a)).   We know now that this statement was incorrect.   What matters, though, is the information known or "reasonably discoverable" by Agents Fattibene and O'Malley at the time they issued the detainer.   The collective knowledge doctrine is instructive in this regard.   Ordinarily, the collective knowledge doctrine is used in two circumstances by law enforcement officers to justify an arrest. Austrino, 898 So. 2d at 657.   The first is when an arresting officer with no personal knowledge of any facts establishing probable cause nevertheless is directed to make the arrest by other officers who do have probable cause. Id.   The other is when the arresting officer possesses personal knowledge that, standing alone, is insufficient to establish probable cause but when shared with the knowledge of other officers collectively meets the requirement.   Id. (citing Charles v. Smith, 894 F.2d 718, 724 (5th Cir.), cert. denied, 498 U.S. 957 (1990)).

The doctrine, however, works the other way as well.  Just as officers may permissibly act upon their collective knowledge, so too are they restrained by their collective ignorance.  <u>Albo v. State</u>, 477 So. 2d 1071, 1074 (Fla. 3d DCA 1985)(citing <u>United States v. Hensley</u>, 469 U.S. 221 (1985)).  Police may not rely upon incorrect or incomplete information when they are at fault in permitting the records to remain uncorrected.  <u>Id</u>. at 1075 (citing 1 LaFave, Search and Seizure § 3.5(d), at 636 (1978)).

In claiming that Mr. Douglas was not a citizen of the United States, Agent O'Malley testified that he relied on various computer and immigration records, *including Mr. Douglas's A-file*, and a 1989 police report that includes a statement that Mr. Douglas "speaks with a British accent and is from the U.S. Virgin Islands.  He is on a temporary visa" (O'Malley deposition, p. 26, ln. 24 – p. 31, ln. 18; Ex. 7(n)).[12]

The fact that Agent O'Malley claims to have relied on this document, even in part, is disturbing for multiple reasons.  First and foremost, the document is from 1989.  Any number of circumstances could have changed in the sixteen years that followed.  Secondly, the information in the police report was not an admission from Mr. Douglas.  The information instead came apparently exclusively from an alleged victim.  Thirdly, and most importantly, it was flatly inaccurate in every way.  Mr. Douglas does not speak with a British accent, is not "from the U.S. Virgin Islands," and was not here on a temporary visa in 1989.  Rather, he was born in St. Kitts, a British territory, and initially came to the United States as a Legal Permanent Resident (Ex. 7(d)).

Considering that Agent O'Malley was so thorough in his pre-NTA investigation that he noticed a small passage in a 1989 police report, surely he would have looked closely at Mr.

---

[12] Agent O'Malley did not have the police report in front of him and could not remember its exact date.  However, by deduction, the attached exhibit is the only possible police report that he could have been referencing.

Douglas's and Ms. Weiner's A-files, too.  However, whether he ever examined Mr. Douglas's or Ms. Weiner's A-files *at all* in 2005 is unclear.[13]  As referenced above, Agent O"Malley indicated at one point in his deposition that he believed he looked at Mr. Douglas's A-file (O'Malley deposition, p. 31, lns. 17-18).  At another time, he indicated that he did not know whether he looked Mr. Douglas's or Ms. Weiner's A-files (id., p. 13, lns. 3-9; p. 19, lns. 12-16).

What *is* perfectly clear is that if Mr. Douglas's A-file had been properly and thoroughly examined in 2005, Agents Fattibene and O'Malley would have seen that Mr. Douglas had been in the United States since 1977 (Ex. 7(e)), became a Legal Permanent Resident in 1977 (Ex. 7(d), was born out of wedlock (Ex. 7(c)) and claimed to be the son of a naturalized United States citizen (Ex. 7(e) and (f)).[14]  Reasonably prudent officers would have at the very least then looked closely at Mr. Douglas's mother's A-file and seen her certificate of citizenship.

Significantly, this is exactly what Meryl Finnerty, a supervisor with USCIS, did on April 29, 2008, when she reviewed the files (Ex. 7(h)).  It took Ms. Finnerty less than 24 hours to opine in a written e-mail that Mr. Douglas was a United States citizen (id.).[15]  Consequently, DHS constructively had knowledge that Mr. Douglas was a United States citizen and certainly did not have a "reasonable ground of suspicion supported by circumstances strong enough…to warrant a cautious person in belief that the named suspect" was not a United States citizen.

Thus, the law holds Agents O'Malley and Fattibene responsible for the information in the collective consciousness of the Government.  Whether this Court finds that the agents were presumed to know everything in files that were available to them or simply that a reasonable

---

[13] If Agent O'Malley did not review Mr. Douglas's and Ms. Weiner's A-files, this most certainly would work against any argument that he acted reasonably in investigating Mr. Douglas's citizenship.  If he did review the A-files, he obviously did not do a thorough review, as two years later, Meryl Finnerty was able to determine in less than 24 hours that Mr. Douglas was a United States citizen after she reviewed the files. *See p. 16, infra.*

[14] The officers would have also seen that one of the crimes of moral turpitude alleged against Mr. Douglas, a theft from 1987, resulted in a 212(c) waiver in 1989/90.  Thus, the officers wrongly used this conviction as a basis for removability.

[15] As discussed above, it took Ms. Finnerty only about thirty (30) minutes to come to this conclusion after the fact.

investigator would have looked at Mr. Douglas and Ms. Weiner's A-files more thoroughly (or at all), the result is the same.[16]  The officers arrested Mr. Douglas without probable cause.

**B.     Any Probable Cause Disappeared, at the latest, on January 25, 2006**

As discussed above, Mr. Douglas informed Adolphus Teel, an Immigration Enforcement Agent, on January 19, 2006, that he was a United States citizen (Douglas deposition, p. 80, ln. 1 – p. 81, ln. 3).  Mr. Teel told Mr. Douglas to speak to a supervisor at Bradenton Detention Facility, where he was due to be transported and did no further investigation (id. at p. 88, lns. 4 – p. 89, ln. 7).

Then, on January 19, 2006, Mr. Douglas began typing a letter to his assigned immigration officer listing the reasons why he should not be detained (Douglas deposition, p. 175, ln. 17). Mr. Douglas wrote, "Line 1 of the [NTA] is partial in truth, but under Immigration Law, I became a naturalized citizen when my mother was naturalized.  At the time she did, I was a minor child under the age of 18.  This can be verified by your own records.  My mother's name is:  Larisene Ilona Weiner who resides at the following address:  [Redacted in A-file copy].[17] This claim on it [sic] own exempts me from Deportation proceedings, because I became automatically naturalized when my mother did" (Ex. 7(b)).

Mr. Douglas's claim to citizenship could not have been any clearer.  The Government admits that Mr. Douglas submitted this document on or about January 24, 2006, and that

---

[16] Mr. Douglas was put into deportation proceedings in 1989 (he was not incarcerated in 1989, however) and did not realize at the time that he was a derivative citizen.  Those proceedings, however, are the death knell for the Government because in attempting to deport Mr. Douglas, the then-INS (now ICE) gathered numerous documents establishing (unbeknownst to Mr. Douglas or the Government then) Mr. Douglas's derivative citizenship and put them into Mr. Douglas's A-file.  Thus, there is no debate that all of the documentation establishing Mr. Douglas's citizenship was in his A-file in 2005.  The Government will likely argue that agents in 2005 had knowledge that Mr. Douglas was put into deportation proceedings in 1989 and, therefore, had no reason to suspect he was a United States citizen.  This presupposes two things – 1) agents in 2005 actually examined Mr. Douglas's A-file closely enough to see that he was put into deportation proceedings in 1989, and 2) that it is a valid defense that the Government wrongly tried to deport Mr. Douglas once before and got away with it.  Make no mistake, the Government has now twice wrongly tried to deport Mr. Douglas.

[17] The address was not redacted in the original document given to Officer Tolentino.  It was subsequently redacted by the Government when providing the same to the undersigned in discovery.

Deportation Officer Carlos Tolentino responded on January 25, 2006 (No. 9 to Ex. 2).[18]  Officer Tolentino's response was curt: "Talk to the judge" (Ex. 1 to Tolentino deposition; Responses to Second RFA, No. 10 (Ex. 7(b)).

Officer Tolentino's deposition testimony was stunning.  Officer Tolentino believes that he looked at Mr. Douglas's A-file in January 2006, but did not look at or request Ms. Weiner's A-file (Tolentino deposition, p. 19, ln. 8 – p. 21, ln. 2). Instead, he believes that he looked at a computer system known as "CIS"[19] and saw that Ms. Weiner's immigration status was blank (id., p. 22, lns. 19-24). This meant to him that Ms. Weiner was a resident alien and not a United States citizen (id., p. 22, lns. 1-6). The most amazing part of his testimony is that Ms. Weiner's CIS screen *still* shows to this day, nearly thirty years since her naturalization, that she is not a United States citizen (id., p. 22, ln.1 – p. 23, ln. 2)! As cited above, failure of an agency to update records is no defense when an officer relies on outdated information. <u>Austrino</u>, 898 So. 2d at 959 (citing <u>Anderson v. Creighton</u>, 483 U.S. 635 (1987)).

As if that weren't bad enough, Officer Tolentino, now a supervisor, testified that he believes that the CIS computer screen is a better source of information with respect to a person's citizenship than a person's A-file (id., p. 37, lns. 3-24). Disturbingly, this testimony came *after* Officer Tolentino acknowledged that Ms. Weiner's A-file contained proof of her citizenship while her CIS screen did not (id.).

Officer Tolentino also testified that he believed that in January of 2006, DHS's unwritten policies did not require him to investigate thoroughly a detainee's claims to U.S. citizenship (id., p. 12, ln. 25 – p. 13, ln. 8; p. 26, lns. 8-17). He testified that the requirement to investigate thoroughly did not occur until 2008 when the written policies were put in place (id., p.15, lns. 1-

---

[18] During his deposition, Mr. Douglas indicated that he probably actually submitted the memorandum on January 24, 2006 (Douglas deposition, p. 175, lns. 16-17).

[19] Officer Wehying identified this as the Central Index System (Wehying deposition, p. 10, ln. 17 – p. 11, ln. 11).

15; p. 26, lns. 8-17).  He believed that it was not his responsibility to do so because the detainee was in immigration proceedings and an immigration judge should make that decision (id., p. 16, lns. 14-16).

Not only is this contrary to every other officer's testimony in the case, but the written policy put in place in May 2008 was nothing other than a codification of federal (and Florida) law.[20]  Austrino, 898 So. 2d at 959 (citing Anderson v. Creighton, 483 U.S. 635 (1987)).  Officer Tolentino appears to erroneously believe that his responsibilities are dictated by official written policies rather than the United States Constitution.  It should go without saying that the law has always required an assigned deportation officer to investigate a person's claims to citizenship thoroughly – and not by simply looking on an outdated computer screen.  Unfortunately for Mr. Douglas, in Officer Tolentino's case, it apparently did not go without saying.

Officer Tolentino did concede that had he been shown Ms. Weiner's naturalization certificate, he would have looked into the matter further (Tolentino deposition, p. 24, ln. 15 – p. 25, ln. 5).  Of course, Mr. Douglas was in custody and had no access to Ms. Weiner's A-file.  Officer Tolentino, on the other hand, could have requested the A-file at any time and found the document.  Mr. Douglas told Officer Tolentino exactly where to look, he simply opted not to do so (id., p. 34, ln. 23 – p. 36, ln. 11).

Despite being required by DRO policies and, more importantly, the U.S. Constitution to promptly investigate any claims to citizenship, Officer Tolentino turned a blind eye to the claims. Under no circumstance can it be said that the Government had probable cause to further detain

---

[20] Although the first written policies and procedures in this regard went into effect on May 23, 2008, Deportation Officers Don Chism and Burt Wehying indicated that it was the policy, practice and custom of ICE to investigate citizenship matters when there is any indication of derivative citizenship prior to the institution of any formalized written policies (Chism deposition, (Ex. 12), p. 19, ln. 6 – p. 21, ln. 7; Wehying deposition, p. 40, ln. 13 – p. 42, ln. 1).  Officer Chism further indicated that had he received the "Tolentino Memo," he would have immediately followed-up by contacting USCIS and/or his supervisors (Chism deposition, (Ex. 12), p. 21, ln. 8 – p. 22, ln. 4).

Mr. Douglas after he specifically put them on notice of the fact that he was a citizen and pointed them to the documents in their possession establishing his citizenship.

## C.      The Red Herring Period

On March 1 and 2, 2006, Mr. Douglas went to court for his initial bond hearing (Douglas deposition, p. 114, ln. 11 – p. 120, ln. 1). According to Mr. Douglas – and not a single person has disputed this account – Mr. Douglas told the judge that he was a U.S. citizen (id., p. 116, ln. 7 – p. 120, ln. 20). The Government's attorney challenged this and stated that according to her records, Mr. Douglas was not a citizen (id., p. 121, lns. 6-9). The immigration judge then told Mr. Douglas that in the absence of proof from him that he was a citizen, he would have to defend himself against the underlying claims (id., p. 121, ln. 6 – p. 123, ln. 23).

From that point until September 2006, Mr. Douglas challenged the underlying criminal convictions, as he believed that these did not qualify as deportable offenses (id., p. 135, lns. 2-12). In fact, Mr. Douglas was correct in his challenge to the NTA, as one of the two charges against him was for a South Carolina theft conviction from 1987 (id., p. 135, lns. 14-16). (In 1989, an immigration judge granted Mr. Douglas a 212(c) waiver on that charge, making it exempt as an underlying offense in future removal attempts (id.).) Finally, on September 19, 2006, after Mr. Douglas's wife forwarded Ms. Weiner's certificate of citizenship - a document found in his mother's A-file - to an attorney for the Government, Mr. Douglas was able to convince the Government to look into the matter (Tr., Sept. 19, 2006, deportation hearing, (Ex. 5)). Mr. Douglas was granted bond three days later having established for all intents and purposes that he was a United States citizen (Douglas deposition, p. 216, ln. 10). Thus, the matter was yet again brought to the Government's attention in court.

None of what actually happened in court is relevant to this inquiry, however. The instant suit is permissible only because the United States has agreed to waive sovereign immunity. 28 U.S.C. § 2674. With respect to malicious prosecution claims, said claims can only be made against investigative or law enforcement officers. 28 U.S.C. § 2680(h). Immigration prosecutors are not investigative or law enforcement officers. Cao v. U.S., 156 Fed. Appx. 48, 50 (9th Cir. 2005). Moreover, immigration prosecutors are absolutely immune from suit. Fares v. U.S. I.N.S., 29 F. Supp. 2d 259, 262-63 (W.D.N.C. 1998)(internal citations omitted). Similarly, immigration judges are absolutely immune from suit. Id. Thus, what is said in immigration court can no more be used against a detainee than it can be used in the detainee's favor. Cao, 156 Fed. Appx. at 50 ("[T]he actions of the IJ and INS attorneys in this case cannot form the basis of United States' tort liability"). What is important is what the investigative or law enforcement officers knew or should have known. Anything else is a red herring.

This result is only logical. Officer Parra testified that the only way that a deportation officer would know what happened in immigration court would be for the Government attorney (or the immigration judge) to tell the assigned deportation officer (Parra deposition, (Ex. 9), p. 73, ln. 14 – p. 74, ln. 4). Deportation officers are not privy to the Government attorney's notes or courtroom minutes through any type of internal electronic system (id. at p. 74, lns. 5-12). This "wall" between ICE and the Department of Justice is a fatal flaw in the Government's immigration detention process. However, despite this flaw, it would hardly be fair for Mr. Douglas to claim that ICE/DRO lacked probable cause because he claimed in open court that he was a United States citizen when there is nothing to suggest an ICE or DRO officer was present to hear this.[21] Similarly, it would be unjust to hold Mr. Douglas responsible for making statements to the immigration judge in defense of his removal case to the effect that he is a legal

---

[21] Of course, in this case, the Government lacked probable cause well before any hearings took place in court.

permanent resident or a citizen of St. Kitts when no ICE or DRO officer was present to hear these statements or read these documents.

To be clear, for the time period between January 18, 2006, and September 25, 2006, the sole inquiry as to probable cause is what the *officers* knew or should have known, not what the *immigration attorney* or *judge* knew or should have known. Once Mr. Douglas wrote to Officer Tolentino that he was a U.S. citizen, nothing else afterwards matters absent a statement from Mr. Douglas to a deportation officer that he was not a U.S. citizen (and there is absolutely no evidence of that happening). Had Officer Tolentino conducted the inquiry that was required by DRO policies and the U.S. Constitution, he would have learned that Mr. Douglas was indeed a U.S. citizen, bringing this matter to a close literally years before it ultimately ended.

It bears mentioning that if this period of time is considered by the Court, Mr. Douglas clearly and unequivocally put the Government on notice on March 1 and 2, 2006, and then again on September 19 and 22, 2006. There can really be no genuine argument that continued detention after either of those time periods was done with probable cause, *especially* if courtroom dialogue is considered.

**D.      September 25, 2006 – February 19, 2008**

Mr. Douglas filed an N-600 form in open court on September 22, 2006 (Tr., Sept. 22, 2006, p. 25, ln. 25 – p. 26., ln. 1 (Ex. 6)). The N-600 form is an Application for Certificate of Citizenship to be filled out by the person seeking a certificate of citizenship.[22] Shortly after his release on September 25, 2006, Mr. Douglas mailed a separate N-600 form to USCIS in early October 2006 (Douglas deposition, p. 214, lns. 9-12; p. 217, ln. 23 – p. 218, ln. 1; p. 274, ln. 8 –

---

[22] Another such form is an N-400 form. This form, named "Application to File Petition for Naturalization" has a section wherein the applicant is asked if he/she would like a certificate of citizenship for children in the United States under the age of 18. Ms. Douglas completed this form on September 10, 1981, and specifically wrote that she wanted a certificate for "Douglas, Rohan" (Ex. 8(b) at U.S. 984). No certificate was ever issued. Thus, the seeds of the instant tort were sown long ago.

p. 275, ln. 25; p. 296, ln. 16 – p. 297, ln. 12; Ex. 7(g)). This document was never adjudicated by USCIS (Vliet deposition, p. 34, ln. 17 – p. 35, ln. 9; Ex. 7(h)). As indicated above, it appears that there were no procedural safeguards in place such that one agency would alert the other as to developments in a person's immigration status (Parra deposition, (Ex. 9), p. 73, ln. 14 – p. 74, ln. 17). Thus, it appears that neither the N-600 form filed in immigration court nor the N-600 form filed with USCIS were ever known to ICE (or USCIS for that matter)(id.; Ex. 7(h)). Consequently, when Mr. Douglas was arrested on what ultimately resulted in misdemeanor charges in February 2008, there was nothing in ICE's computer system alerting them to the fact that Mr. Douglas was a United States citizen (Wehying deposition, p. 27, ln. 16 – p. 28, ln. 15).

**E.      February 19, 2008 – April 30, 2008**

Mr. Douglas was re-arrested by ICE pursuant to a detainer on February 19, 2008 (Doc. # 13, ¶ 10).   That day, he spoke to Officers Don Chism and Burt Wehying by phone from Hillsborough County Jail (Douglas deposition, p. 227, ln. 22 – p. 230, ln. 11).  On February 20, 2008, Mr. Douglas was transported to the ICE office in Tampa whereupon he immediately showed the ICE agents the paperwork that showed that he was a United States citizen (Douglas deposition, p. 233, ln. 12 – p. 235, ln. 8).   His paperwork included his bond papers from September 22, 2006, his mother's naturalization certificate and a copy of his N-600 application for citizenship (id.).  He immediately told Officer Burt Wehying and possibly Officer Don Chism that he was a United States citizen (id., p. 234, lns. 1-24).[23]  Officer Wehying admitted during his deposition that Mr. Douglas made this claim to derivative citizenship in the middle of the afternoon and that he could have located the A-files of Mr. Douglas and Ms. Weiner through the

---

[23] Don Chism could not recall anything about Mr. Douglas's case and could not say one way or the other whether or not he had any interaction with Mr. Douglas whatsoever (Chism deposition, (Ex. 12), p. 10, ln. 13 – p. 11, ln. 2). Mr. Wehying remembered Mr. Douglas claiming that he was a United States citizen (Wehying deposition, p. 20, lns. 2-6).

History Inquiry computer program if he had the inclination (Wehying deposition, p. 43, lns. 4-21). He further admitted that he could have called Miami, where the files were located, to speak with someone about the contents of the respective A-files (id.). He opted not to do so, choosing to rely on the same outdated computer screen that Officer Tolentino relied on and his apparent belief that Mr. Douglas was not credible (id., p. 27, ln. 22 – p. 28, ln. 15).[24] In this regard, Mr. Wehying indicated when he looked at Ms. Weiner's information on the Central Index System on February 20, 2008, the information regarding her nationality suggested that she was not a U.S. citizen because there was nothing written next to the words "NATZ DATE" (id., p. 25, lns. 2-10; Ex. 2 to Wehying deposition).[25] Therefore, he argues, he was justified in 2008 in accepting this as evidence that Mr. Douglas was not a derivative citizen (id., p. 24, ln. 15 – p. 25, ln. 10). Of course, at that point, Mr. Douglas had shown Ofc. Wehying a copy of Ms. Douglas's naturalization certificate thereby alerting Ofc. Wehying to the fact that the computer screen had not been updated sufficiently (Douglas deposition, p. 233, ln. 12 – p. 235, ln. 8).[26]

Officer Wehying's actions on February 20, 2008, were in direct contravention of the custom, practice and procedure of the Tampa ICE office with respect to actions officers are supposed to take when confronted with an individual making a claim to derivative citizenship. In this connection, Officer Wehying admitted that it was the custom, practice and policy of ICE to take claims to derivative citizenship very seriously and to investigate them thoroughly

---

[24] Mr. Wehying indicated that even up to the date of his deposition (January 4, 2011), his review of the computer printout from the Central Indexing System regarding Ms. Weiner's nationality suggests that she still is not a U.S. citizen (Wehying deposition, p. 25, ln. 22 – p. 26, ln. 4). Therefore, he argues, he was justified in 2008 in accepting this as evidence that Mr. Douglas was not a derivative citizen (id., p. 24, ln. 22 – p. 25, ln. 1). Of course, at that point, Mr. Wehying had been shown a copy of Ms. Douglas's naturalization certificate and must have known that the computer screen had not been updated sufficiently.

[25] The Central Index System is used by ICE for various reasons including checking on an individual's nationality. The NATZ DATE should reflect the date a person became a naturalized citizen.

[26] Officer Wehying could neither confirm nor deny that he was shown Ms. Weiner's certificate of naturalization (Wehying deposition, p. 16, lns. 5-10). Thus, this fact is undisputed. Jones v. U.S., 49 Fed. Cl. 516, 520-21 (Fed. Cl. 2001); Woods v. Paradis, 380 F. Supp. 2d 1316, 1328-29 (S.D. Fla. 2005)("[A]n inability to recall cannot controvert [a witness's] undisputed characterization of the events.").

(Wehying deposition, p. 45, ln. 21 – p. 46, ln. 15).  Clearly, Officer Wehying did not abide by ICE policy (or U.S. Constitutional law) on this occasion.  At his deposition, Officer Wehying submitted the outrageous position that he did not know the phone number of the duty attorney in Miami and that the Miami office is not the "most approachable of offices," so he did not make any calls (id., p. 50, lns. 2-9).

Though Mr. Wehying's memory of the events of February 20, 2008, is sufficiently egregious, Mr. Douglas's memory of that day is even worse.  Mr. Douglas recalled Officer Wehying instructing a female Asian officer to look into the matter of Mr. Douglas's claim to citizenship and that the Asian officer came back some time later and indicated that Mr. Douglas was in fact a citizen (Douglas deposition, p. 235, lns. 14-23).  Significantly, Mr. Wehying could not recall one way or the other whether or not this series of events occurred, but he did concede that a female Asian agent by the name of Christine Choo-Yick did work at the Tampa ICE office at that time (Wehying deposition, p. 19, ln. 4 – p. 20, ln.1).

Regardless of which version is more accurate, the undisputed facts are that Officer Wehying did not do anything other than look on his computer screen for Mr. Douglas's and Ms. Weiner's nationalities and did not look into the matter any further before or after sending Mr. Douglas to Krome (id., p. 28, ln. 25 – p. 29, ln. 2).

Upon reaching Krome, Mr. Douglas told officers that he was a United States citizen (Douglas deposition, p. 237, ln. 11 – p. 240, ln. 20).  However, Mr. Douglas was sent off to Glades County before officers could investigate the matter (id., p. 240, ln. 22).  Upon reaching Glades County, Mr. Douglas told DRO officers that he was a citizen (id., p. 241, ln. 15 – p. 242, ln. 24).  Nothing was done until he went on a hunger strike, and even then it appears that it took over a month to release Mr. Douglas (id., p. 248, lns. 10-25; Ex. 7(h)).

Clearly, there was no probable cause for any part of this detention whatsoever. Then, although it was clear that Mr. Douglas was a United States citizen, ICE put Mr. Douglas on electronic monitoring.

### F.  May 1, 2008 – November 14, 2008

By April 30, 2008, it was evident to all that Mr. Douglas was a United States citizen. This fact, however, did not prevent ICE from putting restrictions on Mr. Douglas. On that date, ICE ordered that Mr. Douglas be placed on electronic monitoring where he would remain until USCIS provided him with a certificate of citizenship on November 14, 2008 (id., p. 258, ln. 22 – p. 259, ln. 7; Ex. 7(j)).[27]  As a part of his restrictions, he was given a curfew and told to remain within Hillsborough County (Douglas deposition, p. 250, ln. 23 – p. 251, ln. 4; p. 255, ln. 2 – p. 256, ln. 17). There was absolutely no basis for these restrictions.  By that point in the proceedings, the only possible issue with respect to Mr. Douglas's citizenship status was whether or not he could somehow be considered legitimate under the laws of St. Kitts.[28]  Of course, this issue should have been resolved in 2005, long before Mr. Douglas was ever detained.  It can be no defense that after incarcerating Mr. Douglas for nearly 400 days and then placing him on electronic monitoring, the Government finally got around to addressing a question that could have been answered at any point along the way.  Moreover, the fact that Mr. Douglas's birth certificate showed that he was born out of wedlock made it probable that he was *illegitimate*, not

---

[27] Mr. Douglas did not go onto electronic monitoring until about May 16, 2008, when he completed a stay in the Hillsborough County Jail which was the result of ICE's failure to transport Mr. Douglas to a court date.  See p. 8, supra.
[28] It still took until August 1, 2008, for the Government to even look into the issue of legitimacy.  In doing so, USCIS Adjudication Officer Edly Vliet worded her inquiry in such a way that it was evident that the Government was searching for a way out of the conundrum they had created.  The question was worded as follows: "How is a child legitimated by a parent if born to unwed parent's [sic] and father is not listed on birth certificate?" (Ex. 7(l) to this motion).

the converse.[29]  Thus, it would simply be disingenuous for the Government to suggest that this

one unresolved element is what gave them the probable cause to continue depriving Mr. Douglas

of his liberties.

## V.  THE GOVERNMENT IS LIABLE FOR FALSE IMPRISONMENT

In Florida, there is no distinction between the torts of false arrest and false imprisonment.

Johnson v. Weiner, 19 So. 2d 699, 700 (Fla. 1944).  The two are distinguishable only in

terminology.  Id.  The essential elements of a cause of action of false imprisonment are:  (1) the

unlawful detention and deprivation of liberty of a person, (2) against that person's will, (3)

without legal authority or color of authority, and (4) which is unreasonable and unwarranted

under the circumstances.  Mathis v. Coats, 24 So. 3d 1284, 1289 (Fla. 2d DCA 2010)(internal

citations omitted).  The gravamen of the tort of false arrest is the unlawful restraint of a person

against that person's will.  Austrino, 898 So. 2d at 957 (citing Johnson v. Weiner, 155 Fla. 169

(1944)).   The existence of probable cause is crucial to both false arrest and malicious

prosecution.  In a malicious prosecution case, the plaintiff must establish an absence of probable

cause as an element of the tort; in a false arrest case, the existence of probable cause is an

affirmative defense.  Daniel v. Village of Royal Palm Beach, 889 So. 2d 988, 990 (Fla. 4th DCA

2004); Austrino, 898 So. 2d at 957.  Again, the key issue is determining if there was probable

cause to detain Mr. Douglas and, if so initially, did that probable cause evaporate at some point.

Mathis, 24 So. 3d at 1290 ("Although probable cause existed at the time [the plaintiff] was

---

[29] One month after Ms. Vliet's request, Senior Foreign Law Specialist Stephen Clarke returned a report that clearly showed that the Saint Christopher and Nevis (St. Kitts) Status of Children Act of 1983, which granted legitimacy to children born out of wedlock in certain circumstances, did not apply to issues of citizenship (Ex. 7(m) at U.S. 562). Though Mr. Clarke largely ignored this wording in his report and made every effort to draw unnecessarily lengthy comparisons to Jamaican law in reaching his non-committal conclusion, Ms. Vliet clearly realized that Mr. Douglas was illegitimate under the law of St. Kitts.  Parenthetically, Mr. Clarke did not even bother to address whether the 1983 law retroactively applied to children born and/or reaching the age of majority before the enactment of the law (see Ex. 7(m)).

arrested at the scene, she may be able to demonstrate that probable cause evaporated at some point after she was transported to [jail].").

As a preliminary matter, in a prior filing, the Defendant indicated that a false arrest claim could not stand in this case because the agents supposedly had legal authority to detain Mr. Douglas (see Doc. #14, p. 6). This is not an accurate representation of the law for two reasons. First, the NTA in the instant case is an executive warrant that is not reviewed by a neutral magistrate. The law places a high premium on arrest warrants because such warrants are issued by neutral magistrates who provide an independent check on executive discretion. See Coolidge v. New Hampshire, 403 U.S. 443, 449-51 (1971). That is why, as a matter of federal constitutional law, search warrants issued exclusively by executive officials involved in an investigation are ignored for Fourth Amendment purposes. See Id. at 450-51.

In the instant case, the notice to appear was signed by Jeffrey Fattibene, a Supervisory ICE Agent based on information supplied to him from John O'Malley, an ICE Special Agent (Fattibene deposition, (Ex. 13), p. 9, ln.12 – p. 10, ln. 4). The 2008 warrant was signed by George Hernandez, a Supervisory Detention Deportation Officer. (Wehying deposition, p. 34, lns. 15-20; Ex. 7(o)). No neutral magistrate ever examined either document's validity (Fattibene deposition, p. 10, lns. 12-14; Wehying deposition, p. 34, lns. 1-6). Under federal constitutional law, the arrests must be considered as warrantless. See, e.g., El Badrawi v. Department of Homeland Security, 579 F. Supp. 2d 249, 275-76 (D. Conn. 2008).

Secondly, under Florida law, "To be liable for false imprisonment, one must have personally participated therein, directly or by indirect procurement." Johnson, 19 So. 2d at 701. As established above, ICE not only "personally participated" in the false imprisonment, but was the sole participant in Plaintiff's false imprisonment. Johnson stands for the principle that a person who

provides false information that leads to a person's wrongful arrest can be liable. Id. Thus, under both Florida and federal law, the Government lacked legal authority to detain Mr. Douglas.

With the preliminary matter resolved, the only issue is whether or not probable cause existed to detain Mr. Douglas. As detailed above, probable cause never existed and, at the very latest, dissipated on January 25, 2006. Without question, there was no probable cause to detain Mr. Douglas a second time. Thus, to the extent that there was probable cause for the first detention, the second period of detention and the electronic monitoring that followed was without any legal justification.

## VI. CONCLUSION

The Government is liable for the claims of malicious prosecution and false imprisonment. For both claims, the Government lacked the necessary probable cause to detain Mr. Douglas from the very outset of his two detentions. Assuming that there was probable cause to detain Mr. Douglas initially, that probable cause disappeared as soon as Mr. Douglas wrote to his deportation officer that he was a United States citizen and told the deportation officer exactly where to look for confirmation of this. Consequently, this Court should grant summary judgment in favor of Mr. Douglas with respect to liability on the claims of malicious prosecution and false imprisonment.

WHEREFORE, Plaintiff prays that this Court enter summary judgment in his favor as to liability only on the claims of malicious prosecution and false imprisonment and allows the matter to proceed to trial on damages as to these claims.

## VII. REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 3.01(j), Plaintiff requests oral argument on the above motion. Plaintiff estimates argument in this matter will take approximately thirty (30) minutes.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and accurate copy of the above-foregoing has been electronically filed with the Clerk of Court by using the CM/ECF system to **PAUL E. WERNER, Esq.,** *Attorney for Defendant United States of America,* United States Department of Justice, Torts Branch, Civil Division, P.O. Box 7146, Ben Franklin Station, Washington, D.C. 20044 on February 15, 2011.

s/Matthew L. Wilson
Matthew L. Wilson, Esquire
Florida Bar No. 0086819
mwilson@wsmslaw.com
**WILLIAMS SCHIFINO MANGIONE & STEADY, P.A.**
One Tampa City Center, Suite 3200
201 N. Franklin Street (33602)
Post Office Box 380
Tampa, Florida 33601-0380
(813) 221-2626 (telephone)
(813) 221-7335 (facsimile)
Attorneys for Plaintiff